## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

MATTHEW C.G.,[1]

        Plaintiff,

v.                                                  ACTION NO. 2:22cv453

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

### UNITED STATES MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

Matthew G. filed this action for review of a decision by the Commissioner ("Commissioner") of the Social Security Administration ("SSA") denying his claim for a period of disability and disability insurance benefits ("DIB") benefits under Title II of the Social Security Act. *See* 42 U.S.C. §§ 405(g), 1383(c)(3).

An order of reference assigned this matter to the undersigned. ECF No. 8. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B), Rule 72(b) of the Federal Rules of Civil Procedure, and Local Civil Rule 72, it is recommended that plaintiff's motion for summary judgment (ECF No. 11) be **GRANTED in part**, and the Commissioner's motion for summary judgment (ECF No. 17) be **DENIED**.

---

[1] In accordance with a committee recommendation of the Judicial Conference, plaintiff's last name has been redacted for privacy reasons. Comm. on Ct. Admin. & Case Mgmt. Jud. Conf. U.S., Privacy Concern Regarding Social Security and Immigration Opinions 3 (2018).

## I.   PROCEDURAL BACKGROUND

Matthew G. ("plaintiff") protectively filed an application for benefits in 2020, alleging he became disabled on December 1, 2019, due to several mental and physical impairments.[2] R. 22, 24, 308–12, 333–42. Following the state agency's initial and reconsideration denials of his claim, R. 78–101, 102–14, plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). R. 139. ALJ Gregory Froehlich held a hearing by video on March 3, 2022, and issued a decision denying benefits on May 17, 2022. R. 22–35, 43–73. On September 1, 2022, the Appeals Council denied plaintiff's request for review of the ALJ's decision. R. 1–6. In doing so, the Appeals Council reviewed additional records supplied by plaintiff from Anthony Fischetto, Ed.D., found them to be insufficient to show a reasonable probability of changing the outcome before the ALJ, and did not exhibit such evidence. R. 2. Therefore, the ALJ's decision stands as the final decision of the Commissioner for purposes of judicial review. *See* 42 U.S.C. §§ 405(h), 1383(c)(3); 20 C.F.R. § 404.981.

Having exhausted administrative remedies, plaintiff filed a complaint on October 28, 2022. ECF No. 1. The Commissioner answered on January 27, 2023. ECF No. 6. In response to the Court's order, plaintiff and the Commissioner filed motions for summary judgment, with supporting memoranda, on February 28 and March 29, 2023, respectively. ECF Nos. 11–12, 17–18. Plaintiff filed a reply on April 5, 2023. ECF No. 19. As oral argument is unnecessary, the case is deemed submitted for a decision.

---

[2] Page citations are to the administrative record the Commissioner previously filed with the Court.

## II.   **RELEVANT FACTUAL BACKGROUND**

Plaintiff presents three issues.  First, he argues that the ALJ's decision is not supported by substantial evidence because of error in assessing the persuasiveness of opinions from NP Calandro, Dr. Fischetto, and Dr. Carroll.  Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Mem."), ECF No. 12, at 22–33.  Second, he argues that the ALJ failed to properly evaluate his subjective statements.  *Id.* at 33–35.  Finally, he argues that a remand is required so that the ALJ may consider new evidence supplied to the Appeals Council from Dr. Fischetto.  *Id.* at 35–37.  The facts germane to these issues are noted below.

### A.   *Hearing Testimony by Plaintiff and Other Information*

At the time of the March 3, 2022 hearing before the ALJ, plaintiff was then 37 years old, and lived in Virginia Beach with his wife, young children, and his 17-year-old nephew.[3]  R. 45, 48, 51; *see* R. 308–09.  Before stopping work, plaintiff served in the U.S. Army and, after discharge, worked in avionics, electronics, and home entertainment system installations.  R. 47, 62–63; *see* R. 338–39, 356–60.  Plaintiff reports that he could no longer work as of December 1, 2019.

Plaintiff testified about medical problems with his back, left hand, headaches, and symptoms of traumatic brain injury ("TBI").  R. 47–50, 56–61; *see* R. 346, 369.  Plaintiff explained that back troubles and associated pain: (1) require that he sit while getting dressed; (2) make it difficult to put on shoes and socks; (3) create "terrible balance" problems; (4) cause bladder control issues; (5) limit or preclude his ability to lift his young daughters and to get them into and out of the car (without occasional help from his nephew); and (6) cause shooting pain and numbness in

---

[3] A treatment note from May 2021 noted plaintiff was the father of three children (ages 12 years old, 2 years old, and 4 months), that the eldest child did not live with plaintiff and his current spouse, and that plaintiff was a high school graduate with over 60 credit hours of college.  R. 983.

his legs.  R. 47–48, 50; *see* R. 56 (describing pain when turning past a certain point "like [a] stabbing . . . in the lungs with a screwdriver").  Plaintiff scored his average back pain level at 4–5 out of 10, but noted that it varies based upon his activities and when it approaches level 9 he lays on the couch until the pain subsides.  R. 48.

Plaintiff attempts to compensate for back pain, by using his arms and legs, but noted that his "left-hand doesn't work" and that, after surgery, he cannot hold a jug of milk with his left hand. R. 49–50.  Plaintiff remains able to lift about 20 pounds with his right hand, as high as his shoulder and head.  R. 50; *see* R. 62 (noting that he used to lift electrical boxes weighing 35 to 50 pounds at work).  Plaintiff carries and uses a cane three to four times a week to help with keeping his balance.  R. 49, 57.  Due to back issues, plaintiff can stand for roughly 25 minutes at a time and shifts positions and leans against things to facilitate standing.  *Id.*  Plaintiff reports that he can sit for roughly 30 minutes at a time, and shifts about and places his legs in different positions to try to avoid tightening of his back muscles.  R. 49–50.

Plaintiff also related that head injuries also contribute to problems with balance and his resulting use of a cane.  R. 56.  Due to problems with his left ear, he described having a feeling of falling back to the left and uses his cane for stability when turning and pivoting to the right.  R. 56.  Due to a brain injury, plaintiff reports high sensitivity to bright lights, such as his kitchen light, and needing to wear "really dark polarized sunglasses" outdoors to avoid "immense" and "debilitating" headaches.  R. 58.  To ward off headaches, plaintiff also wears a hat, even when inside, to limit exposure to bright light.  R. 59.

Plaintiff also has intense tension headaches, which sometimes cause nausea, tingling in his hands, and pain that begins at the base of his neck and moves around to the right side and makes it difficult to move his jaw.  R. 60.  Without medication, such headaches can last up to three to

four hours. *Id.* (noting medication "knocks the edge off [of] it a little bit"). He experiences daily headaches caused by tension and bright lights and finds that napping helps relieve them. R. 60–61; *see* R. 58 (noting he was not taking headache medication at the time of the hearing).

Plaintiff also reported having multiple symptoms of post-traumatic stress disorder ("PTSD"). R. 50–52, 54–56. These include: flashbacks; difficulty controlling emotions and anger; ruminating over past events; hypervigilance; panic when driving and in public settings; forgetfulness; memory issues: difficulty staying on task; the absence of friends due to a lack of trust; and problems sleeping. *Id.* Plaintiff's spouse and nephew help manage these symptoms by accompanying him on outings. R. 51–52. Plaintiff's PTSD symptoms, along with his bad back, lead to "terrible" nights with limited sleep, including difficulties falling asleep, staying asleep, and being awakened by pain. R. 54 (reporting trials of various sleep medicines before current use of melatonin).

As for daily activities, plaintiff reports he is a "stay-at-home" dad, who takes care of the kids, with help from his nephew. R. 53. His activities include feeding the kids, taking them to playgrounds and a nature trail (when able), engaging them with arts and crafts, driving his nephew to the store so that he can go get needed items, walking the dog, and helping his spouse fix dinner after she comes home from work. R. 53–54; *see* R. 48 (noting that he "work[s] [his] daily stuff around [his] pain").

Prior to the ALJ hearing, on October 3 and 4, 2020, plaintiff completed a pain questionnaire and a function report with information similar to that noted above. R. 343–53. In these documents, plaintiff described having constant back and groin pain (radiating up his torso and down his leg) and long-lasting headaches and migraines (12–24 hours). R. 343; *see* R. 351 (describing "extreme" back pain). He reported trying multiple, other forms of treatment, but was then using prescribed,

medical marijuana to "take[] the edge off" the pain, but without resolving it. R. 344. He reported that pain prevented him from: (1) standing/bending over; (2) standing in the shower for more than 10 minutes; (3) carrying or pushing things, like a vacuum or cart; (4) reaching up high or low, such as into a washer; (4) laying down for long or sleeping at night, without hourly changes of position; (5) sitting, standing, or walking for more than 10 minutes; (6) bending down to lift or carry his children; and (7) partaking in social activities and hobbies. R. 344–45; *see* R. 351 (noting ability to walk 20 meters before needing to stop and rest for 10 minutes). Prior to the onset of his conditions, plaintiff reported being able to work and do "everything." R. 347.

Plaintiff remained able to engage in personal care tasks, aside from standing for a long time when bathing. *Id.* At the time of the function report (October 4, 2020), plaintiff advised that, aside from letting the dogs out, he did not care for anyone else. *Id.* Due to the effects of PTSD and TBI, he had problems remembering things and following directions, and his spouse sent him multiple texts and left notes with reminders, including to take medication. R. 346, 348, 351. Plaintiff said that his attention span was roughly one minute, and he did not finish what he started. R. 351. Although he enjoyed cooking, plaintiff no longer prepared his own meals due to the inability to do prep work, to stand for long, and to remember what he was doing. R. 348. Memory problems also precluded his managing and tracking the family's bills and finances. R. 349. Other than wiping off counters, plaintiff reported he could not do house or yard work. R. 348–50. Although he had enjoyed hobbies like hunting, fishing, riding ATVs, and photography, plaintiff very rarely engaged in them anymore due to his conditions. R. 350.

Although he once had an active social life, plaintiff almost entirely gave that up, aside from watching TV and sitting outside with his spouse and dogs. R. 350–51. Plaintiff stated that his TBI not only caused difficulties reading social cues, but also affected his ability to remember and

complete tasks. R. 351. Plaintiff advised that he went outside daily, continued to drive, and remained able to go out alone. R. 349. When venturing out, however, plaintiff reported that PTSD affected his ability to drive and deal with other drivers and encounter new people or places. R. 352; *see* R. 351 (noting inability to handle crowds). Although he shopped using a computer, he complained of forgetfulness while shopping. R. 349. Finally, plaintiff stated that he did not do well in getting along with supervisors, handling stress, and dealing with changes in his routine. R. 352.

### B.    *Hearing Testimony by Vocational Expert*

Dr. Olga Idrissi, a vocational expert ("VE"), also testified at the hearing. R. 44, 61–72. Based on the ALJ's hypothetical[4] and identified limitations and plaintiff's background and employment, VE Idrissi opined that return to past relevant work was impossible. R. 63–64. VE Idrissi opined that such a hypothetical person could, however, work as a photocopy machine operator, a bagger, and an electronics worker, occupations with jobs available in the national economy. R. 64. In response to the ALJ's second hypothetical, adding a limitation for being off task at least 20% of each workday, at unpredictable intervals outside of normal lunch and other breaks, VE Idrissi testified that all employment would be foreclosed. R. 64–65.

---

[4] The ALJ's first hypothetical assumed a person of plaintiff's age, education, and work experience who: (1) could work at light exertion level; (2) could not climb ladders, ropes, or scaffolds; (3) could not balance, but could occasionally perform postural activities, including climbing ramps and stairs, stooping, kneeling, crouching, and crawling; (4) could frequently handle and finger items; (5) could not have concentrated exposure to vibrations, unprotected heights, or moving parts; (6) was limited to work settings with moderate noise levels; (7) could perform work requiring little to no exercise of judgment and whose duties could be learned in a short time of no more than 30 days; (8) could deal with changes in a routine work setting; (9) could interact adequately with supervisors; and (10) could have occasional interaction with co-workers, but none with the public. R. 63–64.

Plaintiff's attorney then presented VE Idrissi with a series of hypotheticals building upon the ALJ's first hypothetical, starting with limiting exposure to certain lighting. R. 65–68. VE Idrissi testified that, if the hypothetical individual needed to take a 10-minute break once every 30 minutes to minimize exposure to fluorescent lighting (or lighting equivalent to daylight) to ward off headaches, that all employment would be eliminated. R. 67–68. Next, VE Idrissi testified that, if the hypothetical individual needed an unscheduled break once a day for 15 minutes beyond regularly scheduled breaks, the identified jobs would remain available. R. 69. If, however, the hypothetical individual would be absent from work two times per month, that would preclude such employment. *Id.* Next, VE Idrissi testified that, if the hypothetical individual frequently or occasionally reacted with verbal aggression to supervisory correction, employment would be precluded. R. 70. Finally, VE Idrissi testified that, during the hypothetical person's 90-day probationary period, employers would not tolerate absenteeism or off task behavior beyond normal breaks. R. 71–72.

## C.   *Relevant Medical Record*

### 1.   *Plaintiff's Disability Rating and Treatment at the Naval Hospital in Jacksonville, Florida*

#### a.   *VA Disability Rating*

Plaintiff has an extensive history of treatment at Department of Veterans Affairs ("VA") facilities dating back well before the alleged onset date of disability. The Court follows the parties' lead in focusing primarily, but not exclusively, on plaintiff's treatment record beginning in December 2019, for physical and mental health issues discussed by the parties and considered by the ALJ.

In 2014, the Army[5] evaluated plaintiff's active-duty status for PTSD and assorted health conditions. *See, e.g.*, R. 426–27, 444. The reviewers determined that plaintiff failed to meet standards for retention due to lumbosacral spondylosis and right-sided lumbosacral radiculopathy, but declined to find that PTSD, TBI, and about 14 other diagnosed physical ailments rendered plaintiff unfit for retention. R. 281, 426–28, 443, 1183. That said, plaintiff was found physically unfit to remain on active duty and placed on permanent disability retirement. R. 443.

On July 18, 2014, the VA proposed to assign plaintiff a combined 80% service-connected rating for these disabilities: PTSD; cervical strain, lumbosacral spondylosis (degenerative disc diseases); chronic right shoulder strain; post-left-wrist fracture pain and limited motion; right hip trochanteric bursitis; left knee patellofemoral pain syndrome; tinnitus; painful scars on left wrist and chin; TBI; right lumbosacral radiculopathy; and temporomandibular joint disorder ("TMJ") with malocclusion and bruxism. R. 247–71.

On October 7, 2019, the VA found plaintiff entitled to a combined 100% service-connected disability rating, and, among other things, added new ratings for right ankle chronic ligament strain, right knee patellofemoral pain syndrome, right hip bursitis with thigh impairment, and post-left-ankle fracture pain and limited motion. R. 283–98, 305 (rating effective as of December 1, 2019); *but see* R. 990 (noting April 7, 2019 effective date of 100% permanent and total disability).

### *b.* *Treatment at Jacksonville Naval Hospital*

After relocating stateside in February 2019, plaintiff treated at the Naval Hospital in Jacksonville, FL, for various conditions. *See, e.g.*, R. 665. During a wellness exam and medication management appointment on February 15, 2019, plaintiff was diagnosed with major depressive

---

[5] As of April 2014, plaintiff served as a Sergeant (E-5) with a military occupational specialty as an armament/electrical/avionics systems repairer. R. 425.

disorder, recurrent, and PTSD, and was prescribed Citalopram. R. 665–69. During a follow-up exam on July 17, 2019, plaintiff reported back pain (level 3 out of 10) and sought medication to assist with productivity upon his return to school. R. 627. A treating physician diagnosed plaintiff with attention deficit hyperactivity disorder ("ADHD") and prescribed a low dose of Concerta. R. 630. During appointments into the Fall of 2019 and because of plaintiff's recurring complaints about a lack of focus his medication was switched to Adderall, with increasing dosages. R. 596, 598, 602, 605, 617, 619, 622. During these visits, plaintiff consistently presented with a euthymic mood and normal affect. R. 598, 604, 621, 629; *see* R. 623 (noting no anxiety or depression).

On February 14, 2020, while seeking a Vyvanse prescription for ADHD from Dr. Christopher Gilbertson, plaintiff reported working as "an instructor and drone pilot." R. 568. Plaintiff advised he was currently taking medications for ADHD and mood stabilization and had issues with "anger outburst[s]." *Id.*

As discussed below, on June 16, 2020, plaintiff submitted social security disability paperwork for completion and virtually met with Dr. Sara Carroll. R. 554–55. Plaintiff complained of back pain and problems with sitting and prolonged standing, lifting items weighing more than 20 pounds, and performing tasks requiring fine motor skills. R. 555 (reporting having five jobs in the last year stemming from absences and frequent breaks).

On August 4, 2020, plaintiff treated with Dr. Matthew Martin for several matters, including a lack of motivation, an inability to keep focused, and back pain. R. 547. Plaintiff complained of some "brain fog," increased forgetfulness and fatigue, said that Vyvanse, Mirtazapine, and Buspirone were ineffective and expressed interest in discontinuing ADHD medications. *Id.* A systems review was normal, including no back pain, except for plaintiff's reports of distractibility and memory issues based on head injuries. R. 548. Plaintiff's mood was euthymic and his affect

10

was normal. R. 549. Dr. Martin diagnosed: (1) fatigue, and directed plaintiff to consult his mental health provider about his symptoms and medications; and (2) dorsalgia, due to chronic, low back pain, and noted plaintiff's desire to re-try physical therapy after injections and radio frequency ablation provided minimal relief. R. 547, 549.

On January 26, 2021, plaintiff saw Dr. Nathaniel Irving for a physical and assorted physical complaints. R. 847. Plaintiff reported that taking Vyvanse was "work[ing] well" and scored his pain at 0 out of 10. *Id.* A systems review reflected no reported back pain, but muscle aches and pain localized to one or more joints or limbs. R. 848. Plaintiff denied any depression, but reported anxiety and sleep disturbances without any decrease in his functional ability. *Id.* A physical and mental exam was mostly normal and noted, among other things, a euthymic mood and normal affect. R. 848–49. Plaintiff returned on February 9, 2021 seeking completion of certain paperwork. R. 841. Although his pain score remained at zero without back pain and his mood was euthymic and his affect normal, plaintiff reported both anxiety and depression, but without emotional lability, sleep disturbance, or decreased functional ability. R. 841–43.

On March 9, 2021, plaintiff sought a refill of Vyvanse, and scored his pain level at 4 out of 10, which he described as distracting but not interfering with his usual activities. R. 835. A systems review revealed no complaints and indicated no back pain. R. 836. Plaintiff reported having a private pilot's license and driving drones. R. 839. He requested a form so that he could seek a Ketamine infusion. R. 838.

On April 12, 2021, plaintiff complained of "increasing mental fogginess" and sought a pain management referral for chronic musculoskeletal pain. R. 823. Plaintiff scored his pain at 6 out of 10 and described it as present throughout his body and joints and muscles, but identified the worst pain as in the right hip radiating to his right groin. *Id.* He also reported worsening ADHD

11

symptoms in recent months that caused difficulty focusing on tasks at hand. *Id.* A physical exam found plaintiff able to walk and get on and off the exam table without difficulty and with full strength in his hips, knees, and ankles, but noted that his range of motion was "quite decreased," he had a limited ability to squat, and felt pain with flexion and extension of the back. R. 825. The exam also revealed a decreased range of motion and pain with twisting, turning, flexion, and extension of the lumbosacral spine. *Id.* Plaintiff presented with a euthymic mood and normal affect. *Id.* Dr. Irvine diagnosed: (a) chronic pain syndrome, and referred plaintiff to pain management and physical therapy; and (b) attention and concentration deficit, and referred plaintiff to neuropsychology. R. 826.

In connection with appointments for a vasectomy, plaintiff scored his pain level at 0 out of 10 on April 22 and as 3 out of 10 on May 6, 2021. R. 903 (noting pain in right flank and hip and lower back), 906.

On May 18, 2021, NP Patricia Quinlan conducted a comprehensive TBI evaluation of plaintiff. R. 976. Plaintiff's injury history included exposure to rocket and explosive blasts and associated blast effects and falls during deployments to the Middle East and Asia from 2004 to 2013. R. 978. During a symptoms inventory, plaintiff rated as ranging from severe to very severe his problems with, among other things, headaches, nausea, light sensitivity, hearing, body tingling and numbness, loss of appetite, concentration, forgetfulness, decision-making, finishing things, fatigue, sleeping, anxiety, depression, irritability, and tolerance with frustration. R. 977–78. He also reported having pain, in the prior 30 days, in his head, leg(s), arm(s), neck, shoulder(s), and lower and upper back. R. 978. A physical exam yielded normal results. R. 979. The results of a cognitive assessment yielded a score of 22 out 30, with deficits found in executive functioning,

delayed recall, and serial 7s.[6]  R. 980.  NP Quinlan concluded plaintiff suffered a TBI, diagnosed headaches (probably cervicogenic), cognitive impairment, probable sleep apnea, PTSD, mood disorder, chronic pain, photosensitivity, bilateral hearing loss, and chronic low back pain, and recommended more evaluation and treatment.  R. 980–81.

On June 2, 2021, plaintiff treated at the behavioral health clinic for chronic back and groin pain and scored his pain as ranging from 1.5/2 to 8-9, with the average pain score of 3.5 out of 10. R. 1072.  While reporting no impact on performance of work/home responsibilities, plaintiff said the pain led to relationship strain, low motivation, and reduced physical activity.  R. 1073.  During a systems review, plaintiff reported fatigue, appetite changes due to medication, sleep problems, and a loss of pleasure.  R. 1073–74.  A physical exam and mental status exam ("MSE") yielded normal results, including a euthymic mood, normal affect, and no depression or anxiety.  R. 1074. This contrasted, however, with plaintiff's self-reporting on a behavioral health assessment, which indicated a moderate risk of suicide, severe mental health distress, and moderate distress in general welfare.  R. 1073.  In response to plaintiff's reports of riding a recumbent bike, walking, hiking, and swimming, the provider told plaintiff to pace himself, to increase low impact workouts (swimming and stretching), and to practice diaphragmatic breathing in pain crises.  R. 1075.

On June 11, 2021, an audio evaluation revealed a moderate sensorineural hearing loss in plaintiff's right ear and severe and profound hearing loss in the left ear.  R. 945 (noting that a hearing aid would help with the right, but not the left ear); *see* R. 1145 (same).

c.    ***Medical Source Statement – Dr. Sara Carroll***

On June 16, 2020, Dr. Sara Carroll completed a medical source statement, primarily

---

[6] Scores of 26 or higher point to normal cognitive ability and scores between 19 and 25 suggest mild cognitive impairment.  *See https://www.healthgrades.com/right-care/dementia/the-moca-montreal-cognitive-assessment-test-for-dementia* (last visited December 4, 2023).

assessing plaintiff's physical capacities. R. 474–78, 555. She identified diagnoses of ADHD, PTSD, depression, insomnia, and low back pain resulting from degenerative disc disease and concluded that plaintiff was not malingering and his impairments would last at least 12 months. R. 474 (noting that 2013 MRIs supported the disc disease diagnosis). She listed plaintiff's symptoms as inattentiveness and forgetfulness, along with "deep, dull, sharp" low back pain, caused by walking, running, jumping, and prolonged standing, resulting in constant pain (at level 3 to 4 out of 10). R. 475. Dr. Carroll opined that plaintiff: (a) could work while seated for less than one hour during regular workdays and workweeks; (b) could stand or walk for one hour while working; (c) needed to get up from sitting every 10 to 30 minutes during a regular workday, but had no need to elevate his legs; and (d) would experience increasing back pain with regular work, which would frequently interfere with attention and concentration. R. 476–77.

Dr. Carroll also opined that plaintiff could occasionally lift and/or carry items weighing 10 to 20 pounds. R. 476. With respect to use of his hands and arms, Dr. Carroll opined that plaintiff: (a) could never/rarely grasp, turn, or twist objects and engage in fine hand/finger manipulations on the left side and could only occasionally do so on the right side; and (b) could only occasionally use his arm bilaterally for reaching, including overhead reaching. R. 477 (noting that plaintiff frequently drops objects and his hands "don't fully open"). Dr. Carroll also said that plaintiff needed unscheduled rest breaks, roughly 30 minutes long, at 1-to-2-hour intervals in a regular workday. *Id.* Dr. Carroll estimated that plaintiff would likely be absent from work due to his impairments more than three times per month. R. 478. Finally, Dr. Carroll dated plaintiff's symptoms and limitations back to at least December 1, 2019, and said emotional factors contributed to their severity. *Id.*

14

### 2.   *Treatment at Desai Health*

#### a.   *Treatment with NP Christopher Calandro*

During 2020 and 2021, plaintiff received psychiatric treatment from Christopher Calandro, A.P.R.N. ("NP Calandro")[7], of Desai Health. Plaintiff treated with NP Calandro either in person or virtually about seven times in 2020, beginning with an initial psychiatric evaluation on January 29, 2020. R. 469–72. At that time, plaintiff was 35 years old and complained of PTSD symptoms, attendant to Army service and exposure to violent and traumatic incidents while deployed. R. 469; *see* R. 426. Plaintiff reported dissatisfaction with, and a lack of progress during, prior treatment at the VA. R. 469; *see* R. 470 (noting limited utility of prescriptions for Effexor, Cymbalta, and Celexa). Plaintiff described "classic PTSD symptoms," including "intrusive memories, mood dysregulation, hyperarousal and hypervigilance" leading to marital and other difficulties in daily functioning. R. 469 (listing examples such as road rage, rumination, irritability, outbursts of anger, feeling "on edge," etc.). Plaintiff reported having very poor sleep habits, symptoms of depression, including lack of motivation and enjoyment, but denied having suicidal or homicidal ideations and denied having such symptoms before his deployments. *Id.*

Plaintiff reported being diagnosed with Attention Deficit Disorder ("ADD") as a boy and performing poorly in middle and high school due to associated symptoms. *Id.* Although briefly treated at that time, plaintiff effectively began treatment for ADD three years earlier by taking low doses of Vyvanse to good effect until insurance refused coverage and he switched to Adderall, which was less effective and caused weight loss, irritability, and anxiety. *Id.*

---

[7] NP Calandro is an advanced practice registered nurse serving as a nurse practitioner with a specialty in psychiatry. R. 1139.

Plaintiff said that PTSD and ADD impacted his well-being, limiting his ability to make a living as a freelance drone photographer and resulting in use of alcohol as a sleep aid. R. 467, 469–70 (also noting daily, modest use of medical marijuana for anxiety and chronic pain and assorted sleep medications). Although noting weight loss, gastro-intestinal reflux, and myalgias, and arthralgia, plaintiff's review of systems was "normal," aside from the psychiatric complaints. R. 471. An MSE found plaintiff: fully oriented; appropriately dressed and groomed; polite and cooperative with normal eye contact; with intact recent and remote memory; with normal speech rate and volume; with a restless and agitated motor and gait; with an irritable mood; with normal thought content but "tangential" thought processes and distractible attention; with an average fund of knowledge; and with fair insight and judgment. *Id.*

NP Calandra diagnosed PTSD and ADD by history. R. 472. NP Calandra proposed to seek approval for a Vyvanse prescription, in lieu of Adderall, also prescribed Mirtazapine for mood, anxiety, sleep, and appetite regulation, and counseled plaintiff on sleep, exercise, diet, and substance abuse. *Id.*

Later on, NP Calandra provided medication management and psychotherapy services to plaintiff.[8] *See, e.g.*, R. 467. On February 26, 2020, plaintiff reported improvement in his mood, depression, sleep, and ability to modulate responses to daily events. *Id.* To build upon this progress, plaintiff sought, and NP Calandra prescribed, a higher dose of Mirtazapine. R. 467–68. Plaintiff said that he hoped to soon begin part-time work with a group that builds and repairs drones and had been attending some Wounded Warrior group outings, finding them somewhat beneficial but also causing PTSD symptoms to flare afterward. R. 467. Results of plaintiff's MSE remained

---

[8] Rather than recite the details from each session with NP Calandra, the Court will focus upon new or changing information developed in such visits.

mostly the same, except that he exhibited thought processes that got "off track easily," his motor/gait were within normal limits, and his mood was "somewhat improved." *Id.*

Treatment notes for March 25, 2020 reflect that insurance had approved and plaintiff began taking Vyvanse, which aided attentiveness, productivity, staying on and finishing tasks, and helped calm his thoughts. R. 465. Upon request, NP Calandra prescribed increased dosages of Vyvanse and Mirtazapine, over increasing tolerance of and decreasing periods of effectiveness. *Id.* Plaintiff's MSE remained mostly the same as the prior visit, except for "distractible but improved" attention, mildly depressed mood, and "ordered and coherent" thought processes. *Id.*

Plaintiff gave a "mixed report" to NP Calandra on May 26, 2020, based upon his inability to find work and turnover with past jobs, heightened anxiety when triggered by loud noises, road rage ruminations, and reduced alcohol consumption. R. 463 (noting consideration of applying for disability and being a stay-at-home dad). Although plaintiff reported doing "fairly well" on Vyvanse, he and NP Calandra agreed to increase the dosage. R. 463–64. Plaintiff's MSE remained mostly the same, but described his mood as anxious and irritable. R. 463.

On August 7, 2020, plaintiff asked to transition to Wellbutrin (and/or an antipsychotic mood stabilizer) and off of Vyvanse, finding the latter's stimulative effects caused "hyperfocus" and associated rumination and rage over minor slights. R. 730 (noting also that taking Buspar has failed to help with anger). He reportedly applied for disability, noting that anger prevented him from staying employed and caused him to walk away from every recent job. *Id.* However, plaintiff described working to start a nonprofit business with a fellow veteran. *Id.* NP Calandra discontinued Vyvanse and Seroquel, and instead prescribed Wellbutrin and Geodon, continued plaintiff on Mirtazapine, and increased the Buspar dosage. R. 730–31. Plaintiff's MSE results remained mostly the same as the prior visit. *Id.*

17

Roughly two months later, plaintiff reported that he stopped taking Wellbutrin and Geodon due to increased anxiety and over-sedation, and re-started using Vyvanse intermittently. R. 732. He also stopped taking Mirtazapine, finding it less effective over time for insomnia and requested a prescription for Lunesta for intermittent use. *Id.* Although noting some benefit from taking Buspar, plaintiff reported managing anxiety by isolating himself from others, aside from his spouse and daughter. *Id.* NP Calandra prescribed Abilify to stabilize plaintiff's mood, without sedation side effects. R. 732–33. Two weeks later on October 29, 2020, plaintiff said he was "doing better," was sleeping without nightmares, and had reduced anxiety and irritability on Vyvanse. R. 728. NP Calandra increased the dosage for Abilify. R. 729.

After the passage of roughly eight months, plaintiff returned for treatment with NP Calandro only two times during 2021. R. 1127, 1198. On June 28, 2021, plaintiff said that he stopped taking other medications due to lack of efficacy or side effects, began Ketamine therapy with another provider, which (along with a later Zoloft prescription) moderately diminished his depression. R. 1127. Plaintiff reported being very anxious and irritable, sometimes staying awake for 24-hour periods, orally sparring with others over minor matters, having frequent conflict with his wife (who once called the police), isolating from others and spending lots of time in the woods near his house, and driving infrequently and never going to the store. *Id.* Plaintiff reported trying to work as a landscaper, but quickly stopped based on feelings of aggression and difficulties interacting with his boss and others. *Id.* An MSE yielded mostly negative results, but noted, among other things, an irritable and depressed mood, thought processes that easily went "off track," and self-reported short-term memory deficits. R. 1127–28. NP Calandro increased plaintiff's Zoloft dosage. R. 1128.

When NP Calandro next treated plaintiff on August 31, 2021, plaintiff's MSE yielded similar results. R. 1198–99. Plaintiff reported having "a difficult time" and that he stopped taking Zoloft soon after they last met. R. 1198. While unmedicated, plaintiff said that he had frequent spikes in anger as well as panic attacks, and could not calm down when dealing with unexpected events. *Id.* Plaintiff stated that high anxiety levels were causing "cravings to drink," after a lengthy period of limited drinking. *Id.* NP Calandro discontinued Zoloft and prescribed Latuda and limited quantities of Xanax for use during bouts of acute anxiety. R. 1199 (noting plaintiff continued to have Vyvanse for intermittent use).

### b.    *Medical Source Statements – NP Christopher Calandro*

On July 3, 2020 and on July 7, 2021, NP Calandro completed medical source statements (each entitled "Psychiatric/Psychological Impairment Questionnaire"). On both forms, Dr. Calandro reported the diagnoses of PTSD and ADD, medications then prescribed, as well as psychosocial factors such as a history of trauma, unemployment, and marital/parenting stressors. R. 1122, 1135. NP Calandro marked boxes identifying signs and symptoms supporting his diagnoses and traced their onset back to on or before December 1, 2019.[9] R. 1123, 1126, 1136, 1139. The items noted on each form were almost identical and included: (a) mood – depression; persistent or generalized anxiety; and a labile, irritable, and abnormal affect; (b) thought – none; (c) attention, concentration, and intellectual – difficulty thinking or concentrating; easy distractibility; and poor recent memory; (d) fear and paranoia – intrusive trauma recollection; paranoia and suspiciousness; and vigilance and scanning; (e) behavioral and social – anhedonia; impulsive or damaging behavior; intense and unstable personal relationships; pathological

---

[9] NP Calandro explained that support for his diagnoses could be found in the MSEs (documenting plaintiff's labile mood and agitation), plaintiff's hypervigilance, and formal ADD testing plaintiff received as a child. R. 1124, 1137.

dependence, passivity, or aggressiveness; psychomotor agitation (on the July 2021 form only); and social withdrawal and isolation; (f) perception and reality – none; and (g) sleep – insomnia and nightmares. *Id.* NP Calandro identified mood instability and anxiety and paranoia stemming from intrusive, traumatic memories as the most frequent symptoms. R. 1124, 1137. He opined that plaintiff's insomnia exacerbated his increasing chronic pain. *Id.* NP Calandro also specified that plaintiff has interpersonal conflicts due to his hypervigilance and distrust, as well as his labile mood and irritability, leading to withdrawal from work-like settings. *Id.*

NP Calandro also marked boxes rating plaintiff's degree of limitation in various domains of mental functioning involved in full-time work. R. 1125, 1138. On the July 3, 2020 form NP Calandro said that he had not assessed many of the functional categories and, accordingly, marked the box for "unknown" for 16 of the 23 functions. R. 1138. For the remaining seven functions, NP Calandro opined that plaintiff had marked limitations, especially in social interaction and to a lesser extent in concentrating and attending to tasks, working around others, and working without symptoms. *Id.*

NP Calandra fully completed the limitation assessment on the July 7, 2021 form. R. 1125. He generally assessed the following range of limitations in each domain: (a) understanding and memory – moderate to marked; (b) concentration and persistence – moderate to marked; (c) social interaction – marked, other than for adhering to basic neatness; and (d) adaptation – mostly marked, other than for moderate limitations in recognizing and responding to hazards. *Id.* Additionally, NP Calandro opined that plaintiff may be subject to panic attacks while working, based on intrusive traumatic memories. R. 1126, 1138. Although initially opining he did not know how often plaintiff would likely miss work due to his impairments, R. 1139, NP Calandro later estimated this would occur more than three times per month, R. 1126.

### 3.    Treatment at the VA Clinic in Middleburg, Florida

On May 7, 2021, plaintiff underwent a new patient evaluation with the Dr. Maricel Oyola at a VA clinic in Middleburg, Florida, when transiting back to VA mental health services. R. 983–86. During a systems review, plaintiff reported, among other things:  (a) no insomnia (while using Lunesta); (b) no hearing difficulty; (c) having back and neck pain and stiffness; (d) having headaches, but not numbness, weakness, tingling, or problems with speech or memory; and (e) no depression, anxiety, or unhappiness. R. 983–84 (scoring pain at level 3 out of 10). Dr. Oyola's physical exam revealed mostly normal results, except for:  (a) an unbalanced gait; and (b) lower back pain radiating to the right leg and thigh area. R. 984–85. Dr. Oyola's psychiatric exam found plaintiff to be fully oriented, with normal judgment and insight, with an appropriate affect, but having problems with poor concentration, recent and remote memory, and with mood disorder. R. 985. Dr. Oyola diagnosed, among other things, PTSD, adjustment disorder (mood), insomnia, ADHD, lumbar radiculopathy, and cervicalgia.[10] Id.

### 4.    Treatment at Jax Spine & Pain Centers

On May 5, 2021, Dr. Sathavaram Reddy of Jax Spine & Pain Centers conducted a new patient evaluation of plaintiff for nerve damage and spinal degradation. R. 1192. Dr. Reddy's back examination revealed, among other things:  a mildly antalgic gait; paraspinal muscular tenderness and spasm in the lower back; limited range of motion in the lower back due to pain; negative straight leg test results; positive FABER test results (bilaterally) for the thoracolumbar spine; positive lumbar facet loading; normal strength; and normal deep tendon reflexes. R. 1195. Dr. Reddy ordered an MRI of the lumbar and cervical spine and physical therapy. R. 1194.

---

[10] On May 26, 2021, Rachel Lunn, R.N., of the VA clinic screened plaintiff for cognitive impairment and his score results suggested dementia. R. 946–47.

On June 15, 2021, plaintiff met with physician's assistant ("PA") Tremaine Davis to review MRI results (but the record neither contains the MRI records nor recites any findings). R. 1188–90. Plaintiff scored his pain at 3.5 out of 10 and reported right flank pain radiating to the hip and down the right leg, which pain sometimes radiates to the left leg with strenuous activity. R. 1188 (describing constant and dull pain, with spasms caused by high impact activity). Plaintiff also reported neck pain radiating bilaterally to his fingers, with numbness and tingling. *Id.* A physical exam yielded the same findings as those of May 5, 2021. R. 1188–89. PA Davis assessed low back pain, lumbar facet syndrome, mental distress, lumbar radicular pain, and cervical radicular pain, and prescribed Methocarbamol. R. 1189.

### 5.   *Consultative Examinations*

#### a.   *Psychological Examination by Peter Knox, Psy.D.*

On February 8, 2021, Dr. Peter Knox conducted a clinical evaluation of plaintiff. R. 738. Dr. Knox took a longitudinal history that mostly recites the information noted above, but also noted that plaintiff has a herniated disc in the back of his neck. R. 739–40. Dr. Knox's MSE noted normal findings, except for plaintiff's dysphoric mood and nervous affect, and problems with recent and remote recall. R. 741. In pertinent part, Dr. Knox assessed that plaintiff: (1) has "no significant impairment" in "work-related mental activities (IQ)"; (2) has a "good" memory, without "short or long-term problems"; (3) has "no significant issues" with concentrating or persisting; and (4) discussed having issues with social interacting and adaptation. R. 742. Dr. Knox diagnosed PTSD, major depression, and cognitive disorder due to TBIs. R. 743. He assigned plaintiff a global assessment of functioning score of 45.[11]

---

[11] The American Psychiatric Association's GAF scale ranges from 0 to 100 and indicates an overall assessment of a person's psychological, social, and occupational functioning. *Diagnostic and Statistical Manual of Mental Disorders* ("DSM–IV–TR"), 34 (4th ed. 2000). The noted ranges

### b.   *Physical Examination by William Choisser, M.D.*

On April 1, 2021, Dr. William Choisser conducted a physical consultative exam ("CE") of

plaintiff relative to claims of lower back pain and leg neuropathy.  R. 745.  Dr. Choisser's exam

found, among other things:  (a) limited range of cervical spine motion, with muscle spasms; (b)

limited lumbar spinal extension and forward and lateral flexion; (c) limited bilateral hip flexion

due to increasing back pain; (d) good bilateral hip rotation, but with increasing back pain; (e)

normal upper extremity range of motion; (f) normal grip and upper arm strength, with bilateral

lower extremity strength at 4/5; (g) negative straight leg testing for sciatica, but with pain; (h) an

abnormal gait with a short stride and stiff legs, with unsteadiness walking heel to toe; (i) an

unsteady Romberg's test; and (j) a limited ability to squat.  R. 745–46.  Spinal x-rays revealed

straightening of the normal lordotic curve, consistent with "significant muscle spasm."  R. 746.

The x-rays also revealed moderate disc space narrowing at L4-L5, "complete[] collapse[]" of the

disc space at L5-S1, sclerosis of the facets at L5-S1, with the remaining disc spaces, facet joints,

and vertebral bodies appearing to be normal.  *Id.*  Dr. Choisser diagnosed:  (a) chronic low back

pain with degenerative disc disease and arthritis; (b) chronic anxiety and depression; (c) history of

TBI with reduced short-term memory; (d) PTSD: and (e) history of ADD.  *Id.*

---

are linked to the following symptomology: (1) 91–100—no symptoms, superior functioning; (2)
81–90—absent or minimal symptoms, good functioning; (3) 71–80—transient symptoms, no more
than slight impairment in functioning; (4) 61–70—some mild symptoms, generally functioning
pretty well; (5) 51–60—moderate symptoms and moderate functional difficulties; (6) 41–50—
serious symptoms and serious functional impairments; and (7) 31–40—"some impairment in
reality testing or communication . . . and major impairment in several areas" of
functioning.  *Id.*  The DSM–V abandoned the use of GAF scores as a diagnostic tool for
characterizing patient functioning due to the questionable probative value of the
scores. *Diagnostic and Statistical Manual of Mental Disorders* ('DSM–V") 16 (5th ed. 2013).

### c.   Medical Source Statement – Anthony Fischetto, E.D.D.

On January 17, 2022, Dr. Anthony Fischetto, a licensed psychologist, evaluated plaintiff. R. 1149 (also noting review of Dr. Knox's report and NP Calandro's treatment records and source statements).  Dr. Fischetto took an extensive history that recites much of the information noted above, but also describes plaintiff's difficult upbringing and includes details of traumatic events during military service, including the deaths of friends and a civilian, and a 2014 rocket blast that caused spinal cord and head injuries that left plaintiff incapacitated for 10 months and ended his military career. R. 1150–51; *cf.* R. 429 (listing incident as occurring in 2013), 978.  The symptoms identified mostly match those noted above. R. 1150.  Dr. Fischetto's MSE noted, among other things:  full orientation; an angry, irritable, and sad mood; sleeping difficulties and nightmares; decreased appetite and weight loss; crying; low energy; lack of interests; poor self-esteem; normal speech; panic attacks and flashbacks related to PTSD; mostly normal thought processes and content; no active thoughts of suicide; average intelligence; impaired concentration; average recent and remote memory, but with poor immediate retention and recall; poor impulse control; and average test judgment. R. 1152–53.  Dr. Fischetto diagnosed PTSD with panic attacks, describing the prognosis as "poor, guarded, and chronic." R. 1153.

As to functional and other capabilities, Dr. Fischetto opined that plaintiff:  (a) could not competently manage his personal funds; (b) exhibited a "very reactionary" approach to activities of daily living and could not independently shop, maintain a residence, pay bills, or engage in personal care; (c) could only poorly engage in social functioning; and (d) had only a poor ability to concentrate, persist, and keep pace. *Id.*  Dr. Fischetto concluded that plaintiff's condition was chronic, would last longer than 12 months, and that he could not engage in competitive work and was disabled. *Id.*

Dr. Fischetto also completed a psychological impairment questionnaire containing much of the same information noted in his report. *See* R. 1156–58. He assessed plaintiff's degree of limitation in domains of mental functioning during full-time work as follows: (a) in <u>understanding and memory</u> he rated plaintiff with moderate (2) and marked (1) limitations; (b) in <u>concentration and persistence</u> he rated plaintiff with moderate (2), moderate-to-marked (3), and marked (5) limitations; (c) in <u>social interactions</u> he rated plaintiff with moderate (1), moderate-to-marked (2), and marked (3) limitations; and (d) in <u>adaptation</u> he rated plaintiff with moderate-to-marked (4) and marked (1) limitations. R. 1159. Dr. Fischetto dated plaintiff's symptoms and limitations back as far as December 1, 2019 and estimated that he would be absent from work more than three times per month. R. 1160.

### 6.   *State Agency Physician Reviews*

On March 5, 2021, George Grubbs, Psy.D., a psychological state agency consultant, applied the psychiatric review technique and found medically determinable impairments for neurocognitive disorders, depressive, bipolar and related disorders, and trauma and stressor-related disorders did not satisfy the "A" criteria for those listings. R. 85. As for the listings' "B" criteria, Dr. Grubbs found mild limitations in understanding, applying, and remembering information, in concentrating, persisting, and keeping pace, and in self-management and adaptation, and a moderate limitation in interacting with others. *Id.* He found no evidence satisfying any "C" criteria. R. 85–86.

In addressing plaintiff's mental RFC, Dr. Grubbs opined that plaintiff: (a) had no understanding and memory limitations; (b) could "complete simple tasks/work procedures [and] be able to make work decisions but would have difficulties [with] maintaining attention [and] concentration for extended periods"; (c) could "be socially appropriate [and] accept critique[s]

from supervisors but would have difficulties cooperating [with] others"; and (d) could "set realistic goals but would have some difficulties reacting/adapting appropriately to [a] work environment." R. 91–94. Based thereon, Dr. Grubbs opined that "[w]hile the [claimant] may have a mental impairment, it does not appear to be of disabling proportions. [Claimant] appears capable of performing simple, unskilled repetitive assignments [and] tasks." R. 94.

On May 10, 2021 at the reconsideration level, Deborah Carter, Ph.D., a state agency psychologist mostly agreed with Dr. Grubbs' conclusions, but opined that plaintiff's limitations in concentrating, persisting, and keeping pace rose to the moderate level. R. 107. Dr. Carter also found that plaintiff: (a) had no significant understanding and memory limitations; (b) could "attend and concentrate sufficiently to carry out simple, repetitive tasks, at a consistent pace, during a normal workday [and] workweek"; (c) "has had some positive response to medications but can be moody and have difficulty getting along with others"; and (d) remains "able to adapt appropriately." R. 111–12.

On April 6, 2021, Phillip Matar, M.D., a state agency physician opined plaintiff: (a) could lift/carry 20 pounds occasionally and 10 pounds frequently; (b) could sit and stand/walk for 6 hours each in a normal workday; (c) could frequently balance, kneel, crawl, crouch, and climb ramps/stairs; (d) could occasionally stoop and climb ladders, ropes, etc.; and (e) had no manipulative, visual, communicative, or environmental limitations. R. 87–89. Dr. Matar opined that plaintiff "should be capable of functioning within the parameters of this [residual functional capacity ("RFC")]." R. 90. On September 28, 2021, Roland Gutierrez, M.D., a state agency physician, generally agreed with Dr. Matar's conclusions about plaintiff's RFC, aside from finding that he could frequently perform all postural movements and adding an environmental limitation for avoiding concentrated exposure to hazards, such as machinery or heights. R. 109–10.

### III.   THE ALJ's DECISION

To evaluate plaintiff's claim of disability,[12] the ALJ followed the five-step analysis set forth in the SSA's regulations.  *See* 20 C.F.R. § 404.1520(a).  The ALJ considered whether plaintiff:  (a) was engaged in substantial gainful activity; (b) had a severe impairment; (c) had an impairment that meets or medically equals a condition within the SSA's listing of official impairments; (d) had an impairment that prevents him from performing any past relevant work given his RFC; and (e) was able to perform other work considering his RFC, age, education, and work experience.  R. 24–35.

The ALJ found that plaintiff met the insured requirements[13] of the Social Security Act through March 31, 2021, and had not engaged in substantial gainful activity from December 1, 2019, his alleged onset date of disability.  R. 24.

At steps two and three, the ALJ found that plaintiff had the following severe impairments: (a) degenerative disc disease; (b) PTSD; (c) ADHD; (d) neurocognitive disorder; and (e) hearing loss.  R. 24.  The ALJ declined to classify plaintiff's headaches as a medically determinable impairment, due to a lack of supporting records and opinions.  R. 24–25.  The ALJ did, however, treat plaintiff's headaches as a symptom of other impairments and factored the same into

---

[12] To qualify for DIB, an individual must meet the insured status requirements of the Social Security Act, be under age 65, file an application, and be under a "disability" as defined in the Act. "Disability" is defined "as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a).  To meet this definition, the claimant must have a "severe impairment" making it impossible to do previous work or any other substantial gainful activity that exists in the national economy. *Id.*

[13] In order to qualify for DIB, an individual must also establish a disability that commenced on or before the last day in which that individual met the insured status requirements of the Social Security Act. *See* 42 U.S.C. § 423(a), (c); 20 C.F.R. § 404.131(b).

limitations incorporated into the RFC. R. 25. The ALJ further determined that plaintiff's severe impairments, either singly or in combination, failed to meet or medically equal the severity of one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, as required for a finding of disability at step three. R. 25–26.

The ALJ next found that plaintiff possessed an RFC for light work, *see* 20 C.F.R. § 404.1567(b):

> except no climbing of ladders, ropes, or scaffolds. No balancing. Occasional climbing of ramps and stairs, stooping, kneeling, crouching, and crawling; frequent handling and fingering. No concentrated exposure to vibrations, work around moving mechanical parts, or work at unprotected heights. Limited to work settings with a noise level of 3 or moderate. Limited to performing work which needs little or no judgment to do simple duties that can be learned on the job in a short time (up to and including 30 days), able to deal with the changes in a routine work setting, and able to relate adequately to supervisors with occasional coworker and no general public contact.

R. 26–27.

At step four, the ALJ found that plaintiff could not resume past relevant work. R. 33. Finally, at step five, the ALJ found, having considered the VE's testimony and plaintiff's age, education, work experience, and RFC, that plaintiff could perform other jobs in the national economy, such as photocopy machine operator, bagger, and electronics worker. R. 34–35. Accordingly, the ALJ concluded plaintiff was not disabled from December 1, 2019, through March 31, 2021, and was ineligible for disability benefits. R. 35.

## IV.   STANDARD OF REVIEW

In reviewing a Social Security disability decision, the Court is limited to determining whether the Commissioner applied the proper legal standard in evaluating the evidence and whether substantial evidence in the record supports the decision to deny benefits. 42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d

585, 589 (4th Cir. 1996)).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  It consists of "more than a mere scintilla of evidence[,] but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (noting the substantial evidence standard is "more than a mere scintilla," but "is not high").

When reviewing for substantial evidence, the Court does not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig*, 76 F.3d at 589.  "'Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ).'" *Id.* (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)).  The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (citing *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980)).  Thus, reversing the denial of benefits is appropriate only if either (A) the record lacks substantial evidence supporting the ALJ's determination, or (B) the ALJ made an error of law. *Id.*

## V.    ANALYSIS

***A.***     ***Although substantial evidence supports the ALJ's evaluation of NP Calandro and Dr. Carroll's opinions, remand is required due the ALJ's error in evaluating Dr. Fischetto's opinions.***

Plaintiff contends that the ALJ erred in evaluating the medical opinion evidence supplied by NP Calandro, Dr. Fischetto, and Dr. Carroll.  Pl.'s Mem. 23.

### 1.   *The applicable methodology for reviewing medical opinions.*

The SSA revised its evidence rules for claims, like plaintiff's, filed on or after March 27, 2017.  82 Fed. Reg. 5844, at 5853–55 (Jan. 18, 2017); *see also* 82 Fed. Reg. 15132-01 (Mar. 27, 2017) (correcting technical errors in final rule).  Under such rules, an ALJ must consider and explain the persuasiveness of each medical opinion in the record.[14]  20 C.F.R. § 404.1520c(b); *see* 82 Fed. Reg. 5844, at 5854 (noting that the new rules "focus more on the content of medical opinions and less on weighing treating relationships against each other").  ALJ review of medical opinions and findings now is based upon:  (1) supportability, or the relevance and strength of explanations given for the opinion; (2) consistency, or the similarity with other opinions; (3) relationship with the claimant, including length of treatment relationship, frequency of examinations, and the purpose and extent of the relationship; (4) specialization, relating to the source's training; and (5) other factors, including, but not limited to, the source's familiarity with other medical evidence and the SSA's policies and requirements.  20 C.F.R. § 404.1520c(a), (c).

In assessing persuasiveness, however, an ALJ's chief task is to decide and explain whether an opinion or finding is supported and consistent with the record.[15]  *Id.* § 404.1520c(b)(2), (c)(1)–(2); *see* 82 Fed. Reg. 5844, at 5853 (describing these as the "two most important factors").  Explanation about the remaining factors is required only when an ALJ concludes that two or more divergent medical opinions are equally supported by and consistent with the record.  20 C.F.R.

---

[14] A "medical opinion" is a statement from a medical source about a claimant's limitations and ability to perform physical, mental, and other work demands, and to adapt to a workplace environment, despite his impairments. 20 C.F.R. § 404.1513(a)(2).

[15] Supportability is an internal review that requires an ALJ to consider how "objective medical evidence and supporting explanations presented by a medical source . . . support his or her medical opinion(s)." 20 C.F.R. § 404.1520c(c)(1). By comparison, consistency is an external review that requires an ALJ to determine how "consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources." *Id.* § 404.1520c(c)(2).

§ 404.1520c(b)(3). The rules also permit review of a provider's opinions on a collective basis, rather than opinion-by-opinion; negating the need for individual treatment of every medical opinion in the record. *Id.* § 404.1520c(b)(1). This framework guides the Court's review below.

### 2. *The ALJ's evaluation of NP Calandro's opinions.*

Plaintiff argues that the ALJ erred in finding NP Calandro's opinions not persuasive, as they were supported by and consistent with his observations of plaintiff's symptoms and with the overall treatment record. Pl.'s Mem. 23, 26. Plaintiff argues that the ALJ erred in disregarding a treating expert's opinions simply over the difficulty in objectively substantiating mental health symptoms (unlike those of physical conditions), which by nature are variable. *Id.* at 24–26. Finally, plaintiff also argues that, in discounting NP Calandro's opinions, the ALJ erred by over-relying upon plaintiff's activities of daily living ("ADLs"), his improvement with treatment, and part-time work, when none of such matters justified the conclusion that plaintiff could sustain full-time work. *Id.* at 26–28.

The Commissioner contends that the ALJ followed the law and substantial evidence supports his evaluation of NP Calandra's opinions. Mem. in Supp. of Def.'s Mot. for Summ. J. and in Opp. to Pl.'s Mot. for Summ. J. ("Def.'s Mem."), ECF No. 18, at 22–24, 27. The Commissioner argues that NP Calandro's opinions were not supported by his own clinical findings and plaintiff's course of, and improvement during, such treatment. *Id.* at 22–23. The Commissioner also argues that the severe limitations identified by NP Calandro conflicted with the plaintiff's treatment record with others, as well as with his extensive ADLs. *Id.* at 23–24.

The ALJ was not persuaded by NP Calandro's opinions about plaintiff's mental functional limitations, R. 32–33, and substantial evidence supports that decision. To begin, the ALJ correctly observed that a gap existed between the results of plaintiff's MSEs and the limitations proposed

by NP Calandro in his July 7, 2021 questionnaire response.[16]  R. 32.  During nine sessions, NP Calandro found plaintiff's mental status to be mostly normal, aside from variable findings about restlessness, some moodiness (with some anxiety and depression), irritability, distractibility, and not always linear thought processes.  R. 463, 467, 471, 728–33, 1127–28, 1198–99.  Despite issues with PTSD and ADD, plaintiff generally presented as fully oriented, appropriately dressed, groomed, and cooperative, with generally intact memory, with normal speech, with normal thought content, fair judgment and insight, and an average fund of knowledge.  *Id.*

Rather than ignoring the symptoms discussed in the treatment notes, as plaintiff suggests, Pl.'s Mem. 26, the ALJ reasonably relied on these objective findings and could not reconcile them with NP Calandro's opinions about moderate to marked limitations across all areas of mental functioning.  R. 32, 1125–26.  Unfortunately, and as noted by the ALJ, aside from marking various boxes on the questionnaire, NP Calandro failed to fill such gaps by explaining how plaintiff's symptoms precluded all work activity.  R. 32.  This detracted from the supportability of NP Calandro's opinions.

In considering supportability, the ALJ also examined plaintiff's course of treatment with NP Calandro.  *Id.*  When steadily pursuing such treatment and taking his medications, the ALJ observed that plaintiff experienced good symptom control and improved functioning.  R. 28, 32.  By contrast, and as also noted by the ALJ, plaintiff's symptoms worsened after he abandoned treatment with NP Calandro from October 2020 through late June 2021.  R. 28, 32, 1127, 1198.

Evidence also exists to buttress the ALJ's finding that NP Calandro's opinions were inconsistent with other record evidence.  As noted by the ALJ, this includes plaintiff's rather

---

[16] The Court focuses on the July 2021 questionnaire response, because when completing the July 2020 questionnaire NP Calandro candidly reported not assessing most of the functions at issue and offered no opinion about the same.  R. 1138 (marking "unknown" for 16 of 23 functions).

extensive ADLs, such as caring for two young children, driving, dog walking, walking in the woods, efforts at volunteering, part-time business activities, attempts to work at freelance drone photography, attempts to start a business with a friend, work as an instructor, maintenance of a pilot's license, and motorcycle riding. R. 27–28, 32, 52–54, 703, 718–19, 730, 732, 838.

Also, whereas NP Calandro apparently mostly accepted plaintiff's self-reported symptoms in forming his opinions, *see, e.g.*, R. 1123, 1136, the ALJ found reasons to not fully credit them.[17] R. 27–30; *see also* 20 C.F.R. § 404.1520c(c)(2) (checking consistency with evidence from "nonmedical sources"); 20 C.F.R. § 404.1513(a)(4) (defining "nonmedical source" to include a claimant). These reasons included: plaintiff's extensive ADLs; the inconsistency between those ADLs and plaintiff's reports of disabling back pain; plaintiff's efforts to engage in work and other activities involving higher-level mental functioning; the efficacy of plaintiff's mental health treatment, when pursued; prior evaluations indicating retention of significant mental functioning, notwithstanding his TBI and PTSD; the work history after the onset of plaintiff's PTSD and TBI between 2014 and December 2019; and the dichotomy between plaintiff's physical condition as reported to Dr. Carroll and that documented in his mental health treatment records. R. 27–30, 319–21, 356, 358–60, 429, 1173–78, 1181. The ALJ also found little to nothing in the record (or explanation from NP Calandro) to explain how and what caused plaintiff's condition to deteriorate in the months before December 1, 2019, when he ceased working and applied for disability. R. 29. And the ALJ noted the "routine management" of plaintiff's chronic conditions, even after the

---

[17] Rather than disregarding them, *see* Pl.'s Mem. 24, the ALJ explicitly discussed the primary mental symptoms and effects recounted by plaintiff and described in NP Calandro's notes and opinions, including a lack of emotional control, inability to get along with others, PTSD symptoms, and memory problems. *Compare* R. 27 *with* R. 1124; *see also* R. 33 (noting that "[t]reatment records and examinations do not provide evidence that would reasonably support a finding that the claimant is as limited as alleged"), 549, 598, 604, 621, 623, 629, 825, 842–43, 848–49, 1074.

alleged onset date.  *Id.*  These findings also confirm the ALJ's analysis about inconsistency between NP Calandro's opinions and other evidence of record.  R. 32.

Accordingly, the ALJ neither rejected NP Calandro's opinions for any alleged imprecision in and the nature of psychological symptoms, nor substituted his judgment for NP Calandro's on plaintiff's diagnoses.  *See* Pl.'s Mem. 24–26.  Instead, the ALJ properly recognized that a dichotomy existed between the results of NP Calandro's MSEs and his opinions about plaintiff's mental functional capacities.  Nor has plaintiff shown that the ALJ erred in assessing plaintiff's mental functioning by considering efforts to work part-time, ADLs, or plaintiff's improvement on medication.  *See* 20 C.F.R. § 404.1520a(c) (discussing the complex process of rating the degree of functional limitation and identifying pertinent factors such as medication, treatment, structured settings, and quality and level of overall functional performance); *see also* 20 C.F.R. § 1529(c).

Plaintiff also argues that the ALJ failed to discuss the fact that symptoms noted by NP Calandro tracked those observed by Dr. Fischetto.  Pl.'s Mem. 26.  The ALJ, however, acknowledged that the symptoms observed by Dr. Fischetto aligned with those noted by NP Calandro, but attributed this to plaintiff's lack of continued treatment with NP Calandro between August 31, 2021 and January 17, 2022, the date of Dr. Fischetto's evaluation.  R. 32, 1149, 1198. Given the ALJ's prior explanation for discounting plaintiff's reported symptoms and his linkage of the symptoms noted by Dr. Fischetto to plaintiff's failure to pursue treatment and medication, the absence of a more detailed discussion of symptom consistency is immaterial.  R. 32.

### 3.    *The ALJ's evaluation of Dr. Fischetto's opinions.*

Plaintiff argues that the ALJ erred in two ways in evaluating Dr. Fischetto's opinions.  First, plaintiff asserts that, contrary to Social Security Ruling ("SSR") 18-3p, the ALJ considered the issue of treatment compliance in evaluating Dr. Fischetto's opinions.  Pl.'s Mem. 28–29.  Second,

plaintiff contends that, if he was non-compliant, the ALJ could not hold that against him per the guidance supplied by SSR 16-3p, without having evaluated the reasons for that, as well as the absence of evidence of willful non-compliance. *Id.* at 29. Although generally arguing that substantial evidence supports the ALJ's evaluation of Dr. Fischetto's opinions, the Commissioner failed to respond to these arguments. For the reasons discussed below, the Court rejects the first, but accepts the second argument.

SSR 18-3p does not apply here for multiple reasons. SSR 18-3p supplies guidance about how the SSA will apply its regulations, including 20 C.F.R. § 404.1530, when a claimant fails to follow prescribed treatment and when otherwise doing so would enable a claimant to work. SSR 18-3p, 2018 WL 4945641, at *1–2 (Oct. 2, 2018). Of significance here, SSR 18-3p only applies after the SSA (or an ALJ) finds "that an individual is entitled to disability . . . , *regardless of whether the individual followed the prescribed treatment*." *Id.* at *3 (emphasis added). In such cases, the SSA then considers whether that person's medical source prescribed treatment for the disabling impairment, whether the person followed such treatment, whether having done so would restore the ability to work, and whether good cause existed for not following the prescribed treatment. *Id.* at *3–6.

The ALJ made no finding of disability so SSR 18-3p does not apply. *See Myers v. Comm'r of Soc. Sec.,* 456 F. App'x 230, 232 (4th Cir. 2011) (rejecting argument that predecessor to SSR 18-3p applied in absence of a finding of disability). Further, under SSR 18-3p, Dr. Fischetto, a consultative examiner, does not qualify as "an individual's own medical source" who prescribed treatment for plaintiff. *See* SSR 18-3p, 2018 WL 4945641, at *3–4 (noting SSA "will not determine whether the individual failed to follow prescribed treatment if the treatment was prescribed only by a [CE] . . . or by a medical source during an evaluation conducted solely to

determine eligibility to any State or Federal benefit"). Accordingly, SSR 18-3p does not apply to this case.

Plaintiff's second argument implicates another ruling, SSR 16-3p, which provides guidance for evaluating a claimant's symptoms, rather than medical opinions. SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). SSR 16-3p describes the familiar two-step process for evaluating an individual's symptoms, 2016 WL 1119029, at *3–4, a process used by the ALJ in this case. R. 27–28 (deciding whether an impairment exists that could reasonably be expected to produce the alleged symptoms and, if so, evaluating their intensity, persistence, and limiting effects to identify resulting limitations on work-related activities). At the second step, SSR 16-3p indicates that SSA will consider a claimant's "attempts to seek medical treatment for symptoms and to follow treatment once it is prescribed." SSR 16-3p, 2016 WL 1119029, at *8. The ruling further notes that:

> Persistent attempts to obtain relief of symptoms, such as increasing dosages and changing medications, trying a variety of treatments, referrals to specialists, or changing treatment sources may be an indication that an individual's symptoms are a source of distress and may show that they are intense and persistent.
>
> In contrast, if the frequency or extent of treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, or if the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence in the record. We will not find an individual's symptoms inconsistent with the evidence of record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his . . . complaints.

*Id.* SSR 16-3p, therefore, permits an ALJ to consider a plaintiff's compliance with prescribed treatment.

Plaintiff argues that the ALJ erred in doing so here by holding plaintiff's non-compliance against him, without considering the factors described in SSR 16-3p above. Plaintiff asserts that

the record shows that he stopped taking medications due to some combination of intolerable side effects, lack of efficacy, and due to mental illness. Pl.'s Mem. 29. Plaintiff contends that this legal error infected and caused the ALJ to improperly evaluate the persuasiveness of Dr. Fischetto's opinions. *Id.* at 28–29.

The Court agrees. Approximately seven times in his decision, the ALJ refers to plaintiff's inconsistent use and/or discontinuance of mental health medications and failure to regularly attend, and significant gaps in, mental health treatment. R. 28–32. Yet contrary to the guidance provided by SSR 16-3p, the ALJ nowhere considered the reasons for plaintiff's failure to abide by a treatment regimen. The ALJ primarily discounted the symptoms Dr. Fischetto relied on to form his opinions of disabling limitations[18] based upon plaintiff's non-compliance with a treatment regimen, without considering the role played, if any, by other factors in withdrawing from treatment in mitigation.

This omission is material because the ALJ declared Dr. Fischetto's opinions about work-preclusive limitations to be "partially persuasive," based on plaintiff's symptomology when untreated and unmedicated. R. 32. But the ALJ simultaneously found those same opinions "not consistent with findings and reports when claimant is treating as directed," and "not supported by his reported activities during the period of compliance." *Id.* Although it is not impermissible for an ALJ to consider whether a medical opinion accounts for treatment compliance in assessing persuasiveness, in the context of this case the ALJ needed to consider the reasons for noncompliance, consistent with the guidance in SSR 16-3p, before discounting Dr. Fischetto's opinions.

---

[18] In identifying those symptoms, Dr. Fischetto relied not only on his evaluation of plaintiff, but also on his review of NP Calandro's treatment notes and opinions and those of Dr. Knox. R. 1149.

This is so because the ALJ's analysis of those opinions is not only terse, but also mostly relies upon treatment noncompliance as the basis for disregarding them. These shortcomings are potentially acute here because the record contains multiple pieces of evidence about the factors that SSR 16-3p suggests may signal serious mental health symptoms. Such evidence includes plaintiff's persistent attempts to obtain symptom relief, his requests for increased dosages of medications, his regular changing of and cycling through many medications, his requests for varying treatments, including Ketamine infusions, his referrals to other specialists, and his regular changing of treatment sources. *See* SSR 16-3p, 2016 WL 1119029, at *8 (identifying such factors as possibly indicative of distressing, persistent, and intense symptoms). Accordingly, the ALJ erred in evaluating Dr. Fischetto's opinions.

This error was not harmless. After 10 years of Army service with multiple deployments to battle zones abroad, plaintiff suffered from multiple physical and mental ailments that mostly remain unresolved a decade later. These impairments led to both a medical discharge from the Army and a VA award of a 100% service-connected disability rating in 2019. R. 283–98, 305, 990. To gather more information on the current state of plaintiff's mental health impairments and how they affected his ability to work, *see* 20 C.F.R. § 404.1519a(b), SSA twice sought consultative examinations. R. 738–42, 1149–54. Dr. Fischetto conducted the latest examination in January 2022 and opined that plaintiff's mental health impairments were chronic, with a poor prognosis for recovery, and that he suffered from disabling mental functional limitations. R. 1149–54. Against this backdrop and because of the legal error undermining the ALJ's analysis of Dr. Fischetto's opinions, remand is appropriate.

### 4.    *The ALJ's evaluation of Dr. Carroll's opinions.*

Plaintiff also challenges the sufficiency of the ALJ's analysis of Dr. Carroll's opinions on physical impairments.  Pl.'s Mem. 32–33.  Plaintiff argues that the ALJ failed to consider Dr. Carroll's discussion of the results of spinal imaging, along with clinical evidence of recurring low back pain and its causes, as evidence supporting her opinions.  *Id.* at 32.  Plaintiff also argues that spinal x-rays and other treatment findings confirm that Dr. Carroll's opinions were consistent with the record.  *Id.*  In response, the Commissioner argues that the ALJ correctly classified Dr. Carroll's opinions as not persuasive due to the lack of clinical exam findings, the fact of plaintiff's limited treatment for physical impairments, and because the record, including plaintiff's ADLs, contradicted the disabling limitations opined by Dr. Carroll.  Def.'s Mem. 25–26.  Finally, the Commissioner asserts that the mere existence of some arguably contrary evidence fails to overcome the substantial evidence supporting the ALJ's review of Dr. Carroll's opinions.  *Id.* at 27. The Court agrees with the Commissioner for the reasons discussed below.

First, the ALJ correctly determined that Dr. Carroll failed to support her opinions about plaintiff's limitations with clinical findings.  R. 32.  Indeed, the record suggests that Dr. Carroll only met with plaintiff once to complete a brief impairment questionnaire.  R. 554–55 (noting visit was "virtual").   Although Dr. Carroll circled and marked the questionnaire with "x's" and sometimes noted diagnoses, medications, and the like, R. 474–78, her treatment notes contain no indication that she took a patient history, did a systems review, and conducted physical or mental examinations.  R. 474–78, 555.  Instead, the notes state only that "[p]atient endorses significant concerns with sitting and prolonged standing as well as lifting > 20 lbs and fine motor tasks and had 5 different jobs last year due to absences and needing frequent breaks."  R. 555.  If she reviewed plaintiff's full treatment history at the Naval Hospital, Dr. Carroll did not discuss any

findings associated with the same, aside from noting plaintiff's diagnoses, his medications, and the fact that MRIs were taken in 2013. R. 474–75. Therefore, Dr. Carroll provided few facts to support and explain her conclusions about, among other things, plaintiff's ability to sit, stand, and walk at work, his fine motor skills, his ability to lift and carry items, his need for breaks, etc. R. 474–78.

This lack of explanation diminishes the significance plaintiff attaches to Dr. Carroll's opinions. As this Court and others have noted in reviewing opinion evidence, unadorned source statements like these are not too useful. *See Cummins v. Colvin*, No. 2:14cv165, 2015 WL 1526188, at *3, *12 (E.D. Va. Apr. 2, 2015) (noting a "distaste . . . for medical reports that do not contain at least a minimal amount of written explanation" and characterizing the same as "weak evidence at best") (citing *McConnell v. Colvin*, No. 2:12cv5, 2013 WL 1197091, at *6 (W.D. Va. Mar. 25, 2013)); *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993). The same is true here.[19]

Second, sufficient evidence also supports the ALJ's conclusion that Dr. Carroll's findings were inconsistent with the limited treatment record for physical complaints. R. 32. Among other things, the ALJ observed that plaintiff presented with minimal physical complaints during NP Calandro's systems reviews at treatment sessions. R. 30 (noting lack of complaints about sitting, standing, lifting, fine motion, etc.). During NP Calandro's regular systems reviews, plaintiff reported "no complaints except [p]sychiatric," aside from gastrointestinal reflux and musculoskeletal myalgias and arthralgias. R. 463, 465, 467, 471, 730, 732, 1127, 1198.

---

[19] Plaintiff points to Dr. Carroll's notations of constant, low back pain, sparked by walking, running, jumping, and prolonged standing, as supporting "clinical evidence." Pl.'s Mem. 32 (citing R. 475). Missing from such comments, however, is any evidence that Dr. Carroll examined and tested plaintiff's back and hands, or requested updated imaging, such as x-rays.

Plaintiff complains that the ALJ sidestepped several pieces of evidence from other sources that were consistent with Dr. Carroll's findings of low back pain. Pl.'s Mem. 32–33. These included: (a) spinal x-rays on April 1, 2021 revealing straightening of the lordotic curve, indicative of significant muscle spasm, and disc space narrowing and collapse, consistent with chronic low back pain and degenerative disc disease and arthritis, R. 745–46; (b) physical exam findings on April 12, 2021 showing decreased range of motion, reduced ability to squat, and pain with flexion and extension of the back, R. 823, 825; (c) physical exam findings on May 5, 2021 of a mildly antalgic gait, reduced range of motion, spinal muscular tenderness and spasm, and positive Faber/Patrick testing and facet loading, R. 1192, 1195; and (d) physical exam findings on May 7, 2021 of an unbalanced gait and radiating lower back pain, R. 984–85.

As argued by the Commissioner, however, these findings occurred after plaintiff's date last insured of March 31, 2021. Def.'s Mem. 26; R. 24; *see* SSR 18-1p, 2018 WL 4694326, 83 Fed. Reg 49613, at *49615 (Oct. 2, 2018) (noting that a title II benefits claimant must establish existence of disability "*before* his or her insured status expired") (emphasis added). Accordingly, the ALJ mostly focused review on treatment before March 31, 2021, noting that plaintiff had "little treatment for his allegedly disabling physical conditions prior to the date last insured." R. 28. While also noting, for example, Dr. Reddy's examination findings from May 5, 2021, the ALJ explained that the MRIs ordered were never made a part of the record. R. 31. Moreover, after a June 15, 2021 follow-up visit, R. 1188–90, there is no evidence of further treatment with Dr. Reddy. Finally, the ALJ also looked beyond the date last insured for evidence of physical functioning and noted that on June 2, 2021 plaintiff reported engaging in exercise including bike riding, hiking, walking, and swimming. R. 31 (citing R. 1224).

Such activities aligned with ALJ's observations about the dichotomy between plaintiff's allegations of disabling back pain and limited ability to walk and stand and his rather extensive ADLs, including caring for two young children, driving, dog walking, walking in the woods, motorcycle riding, etc., as previously noted. R. 28, 30. Plaintiff's activity levels also corresponded with what the ALJ characterized as the "routine management of his various chronic conditions through the VA Hospital" after the alleged onset date of disability. R. 29. For example, the ALJ observed that on April 4, 2020, a provider noted that plaintiff had been riding a motorcycle and presented with a normal gait while ambulating. R. 703. When treated remotely on August 4, 2020, plaintiff sought and received a referral to physical therapy for low back pain, after finding that other treatment failed to yield positive results. R. 547–50. The record, however, contains no evidence about such therapy. When seen for an annual physical on January 26, 2021, although reporting general muscle and joint aches and limb pain, plaintiff said he had no back pain and gave a pain score of 0 out of 10. R. 847–49. These latter findings recurred on February 9, 2021. R. 841–43. On March 9, 2021, plaintiff had no back pain, but scored other pain at 4 out of 10, describing it as distracting but not interfering with his usual activities. R. 835–36. The ALJ also twice observed that, although taking medications for mental health reasons, plaintiff took none for back pain. R. 31–32; *but see* R. 549 (noting prior corticosteroid injections for back pain at an unspecified date).

For these reasons, the Court finds that the ALJ adequately reviewed the pertinent record, without mischaracterizing or ignoring material facts, and that substantial evidence supports the ALJ's analysis of Dr. Carroll's opinions. *See Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th

Cir. 2014) (noting absence of requirement to specifically address every piece of evidence in the record).[20]

**B.**   *Plaintiff's remaining arguments for overturning the ALJ's decision are closely tied to the error justifying the recommended remand and no need exists to address them.*

Plaintiff's final two arguments relate to the ALJ's evaluation of his subjective statements about his symptoms and to the Appeals Council's treatment of a supplemental report from Dr. Fischetto. Pl.'s Mem. 33–37. As both arguments are linked to the error discussed above regarding the ALJ's discounting of Dr. Fischetto's opinions, and plaintiff's symptomology when untreated, no need exists to address those arguments as such matters will need to be revisited upon remand.

## VI.   RECOMMENDATION

For all these reasons, this Court recommends that: (a) plaintiff's motion for summary judgment (ECF No. 11) be **GRANTED in part**; (b) the Commissioner's motion for summary judgment (ECF No. 17) be **DENIED**; and (c) the case be remanded to the Commissioner for further proceedings. On remand, the ALJ should: (a) reexamine the persuasiveness of Dr. Fischetto's opinions and, in doing so, evaluate the reasons for any treatment noncompliance by plaintiff, consistent with the guidance in SSR 16-3p; and (b) consider Dr. Fischetto's supplemental opinions supplied to the Appeals Council in or about late June 2022, about the significance, if any, of plaintiff's medication regimen and his ADLs relative to his ability to sustain full-time work. R. 75.

---

[20] The Court rejects plaintiff's argument that the ALJ also erred by failing to discuss other factors for assessing persuasiveness, including the length, frequency, nature of treatment, and specialization of the opining provider. Pl.'s Mem. 31–32. The applicable regulations do not require articulation of such other factors, unless an ALJ finds that two or more opinions are equally supported by and consistent with the record. *See* 20 C.F.R. § 404.1520c(a), (b)(2), (b)(3), (c). Likewise, given the undersigned's remand recommendation, no need exists to address plaintiff's remaining argument that substantial evidence supporting a denial of benefits cannot be solely based on non-examining source opinions. Pl.'s Mem. 29–30.

## VII.   **REVIEW PROCEDURE**

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.     Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date this report is forwarded to the objecting party by Notice of Electronic Filing or mail, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure.  Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail.  A party may respond to any other party's objections within fourteen (14) days after being served with a copy.  *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2.     A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court based on such findings and recommendations.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

_____
/s/
Robert J. Krask
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
December 5, 2023

44